ORDERED.

Dated:  September 30, 2016

Caryl E. Delano
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 9:12-bk-12132 FMD
                                                          Chapter 7
Robert Paul Moore, Jr., and
Jennifer Rebecca Moore,

          Debtors.
_____/

Bruce and Carol Ann Forbes,

          Plaintiffs,

vs.                                                       Adv. Pro. No. 9:12-ap-1055-FMD

Robert Paul Moore, Jr., and
Jennifer Rebecca Moore,

          Defendants.
_____/

## MEMORANDUM OPINION ON DISCHARGEABILITY OF DEBT AND OBJECTION TO DISCHARGE AND PLAINTIFFS' MOTIONS TO ALLOW EXCLUDED EVIDENCE AND FOR NEW TRIAL

Bruce and Carol Ann Forbes ("Plaintiffs") hired Moore Pizazz, LLC ("Moore Pizazz") to provide interior design services, furniture, and materials for their newly constructed Naples, Florida home. Moore Pizazz did not complete the project as agreed; Plaintiffs sued and obtained a judgment

against Moore Pizazz and its principal, Jennifer Moore. When Plaintiffs caused automobiles belonging to Jennifer Moore and her husband, Robert Moore ("Defendants"), to be levied upon, Defendants filed a petition for relief under Chapter 7 of the Bankruptcy Code.

Plaintiffs seek to bar Defendants' discharge under 11 U.S.C. § 727(a)(3)[1] for failure to maintain books and records; under § 727(a)(4)(A) for making false oaths relating to their sale of two automobiles, failure to schedule a Chinese Drywall claim, and failure to disclose income imputed to them; and under § 727(a)(5) for failure to explain the loss of Moore Pizazz's assets. In addition, Plaintiffs seek to except their claim against Mrs. Moore from discharge under § 523(a)(2)(A) for misrepresentation regarding the use of the payments they made to Moore Pizazz; under § 523(a)(6) for willful and malicious injury by converting their payments or the goods purchased with those funds; and against both Defendants under § 523(a)(6) for civil conspiracy to commit conversion of their payments and goods.

Plaintiffs' § 727(a)(3) claim was not plead in their original complaint. On May 21, 2014, Plaintiffs filed a motion for leave to amend their complaint to include this claim, stating that they would supplement the motion with the amended complaint.[2] On June 19, 2014, the Court conducted a hearing on the motion and granted leave to amend.[3] Plaintiffs' counsel was directed to submit an order,[4] but did not do so. As described below, the case was abated for some time. Although an amended complaint was never filed, Plaintiffs' § 727(a)(3) claim was tried with the consent of the parties.

---

[1] Unless otherwise stated, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. §101, *et seq*.
[2] Doc. No. 58.
[3] Doc. No. 62.
[4] *Id*.

A companion case, on very similar facts and claims, *Fiandola v. Moore* ("*Fiandola*")[5] was tried before the Court in 2014. At the conclusion of the *Fiandola* trial – which did not include a claim under § 727(a)(3) – Plaintiffs and Defendants agreed to abate Plaintiffs' case and defer trial until the Court ruled in *Fiandola*. When the Court entered judgment in Defendants' favor in *Fiandola*,[6] the Fiandolas appealed. The parties then agreed to further defer the trial of Plaintiffs' case until after the resolution of the appeal.

The *Fiandola* appeal raised three issues:  (1) whether the Court erred in finding that Defendants had no obligation to explain the loss of Moore Pizazz's assets; (2) whether the Court erred in finding that Defendants had not intentionally failed to disclose the sale of two vehicles on their Statement of Financial Affairs; and (3) whether the Court erred in finding that the money received by Mr. Moore from the sale of Moore Pizazz assets should not be imputed as income to Defendants. In 2015, the Court's ruling was affirmed by the District Court[7] and by the Eleventh Circuit Court of Appeals.[8]

The Court conducted trial in Plaintiffs' case on February 26, 2016. The parties agreed that the evidence admitted by the Court in *Fiandola* would be deemed admitted. In addition, during a full-day trial, Plaintiffs presented additional evidence that was not offered in the *Fiandola* trial. Upon the close of evidence, the parties submitted post-trial briefs,[9] and the Court took the case under advisement. Several months later, Plaintiffs moved for a new trial to allow evidence that the Court had excluded at trial.[10]

---

[5] Adv. Pro. No. 9:12-ap-1054-FMD.
[6] *In re Moore*, 508 B.R. 488 (Bankr. M.D. Fla. 2014).
[7] *In re Moore*, 2015 WL 1020368 (M.D. Fla. Mar. 9, 2015).
[8] *In re Moore*, 619 F. App'x 951 (11th Cir. 2015).
[9] Doc. Nos. 96, 97, and 98.
[10] Doc. Nos. 99 and 100.

For the reasons set forth below, the Court finds that Plaintiffs met their burden of proof to establish that Defendants failed to keep or destroyed books and records from which their financial condition and that of Moore Pizazz might be ascertained, and that Defendants failed to establish that their actions or failure to act were justified under all of the circumstances of the case. Accordingly, the Court will deny Defendants' discharge under § 727(a)(3). As in *Fiandola*, the Court finds that Plaintiffs did not met their burden of proof to deny Defendants' discharge under § 727(a)(4) and § 727(a)(5). And the Court finds that Plaintiffs have not met their burden of proof on their claims to except the debt from discharge under § 523.

Last, the Court will deny Plaintiffs' motion to reopen the trial to allow for additional evidence.

## FACTS

### *Plaintiffs' Engagement and Payments to Moore Pizazz*

In 2011, Plaintiffs purchased a newly constructed home in Naples, Florida, from Pulte Homes, a national homebuilder. A Pulte employee referred Plaintiffs to Jennifer Moore and Moore Pizazz for interior design and decorating services.[11] In March 2011, Plaintiffs retained Moore Pizazz to perform interior design services, including construction and painting services, and to provide lighting and furniture items. Plaintiffs signed an engagement letter with Moore Pizazz that provided for a $1,500.00 retainer and an advance deposit of 80% of the cost of any contracted construction projects and furniture orders (the "Engagement Letter").[12] In addition to the $1,500.00 retainer, Plaintiffs gave Mrs. Moore a check, payable to Moore Pizazz, for $50,000.00.[13]

Over the next few months, Plaintiffs became concerned with Moore Pizazz's performance. On September 28, 2011, Plaintiffs met with Mrs. Moore. Mrs. Moore gave Plaintiffs an invoice for

---

[11] Likewise, the Pulte employee had also referred the Fiandolas to Moore Pizazz and Mrs. Moore.
[12] Pls.' Ex. No. 7.
[13] Pls.' Ex. No. 8.

architectural design, furniture, lighting fixtures, and bedding for a total price of $90,412.11 (the "Invoice").[14] After application of Plaintiffs' $50,000.00 deposit, $40,412.11 was stated as the "Balance Due" on the Invoice. Plaintiffs testified that Mrs. Moore showed them copies of invoices that reflected that she had placed purchase orders with third-party vendors for the items described on the Invoice.

Even though Plaintiffs were concerned about Moore Pizazz's performance, they gave Mrs. Moore a check for $40,412.11, in full payment for the services and items that Moore Pizazz was to provide.[15] Mrs. Moore testified that when she presented the Invoice to Plaintiffs, she had already ordered some, but not all, of the items listed on the Invoice.

### *Moore Pizazz's Showroom*

Meanwhile, in August 2011, Moore Pizazz had entered into a lease for a 22,000-square foot showroom (the "Showroom"). Approximately two months later, after Plaintiffs' September 28, 2011 meeting with Mrs. Moore, the Showroom was flooded in heavy rains. Mrs. Moore testified that she then learned that the Showroom had suffered prior water intrusions and was told that the premises were contaminated with "toxic" mold. Mrs. Moore testified that she became ill because of her exposure to the mold and that the Showroom was never opened to the public.

The Showroom landlord's property manager, Scott True, testified that although Defendants had complained about mold, he did not observe any. He testified that he hired a licensed mold investigator and a certified indoor environmentalist to inspect the premises. He acknowledged that mold was found, but in a very small area. Mr. True testified that only a one-square foot wall area had to but cut out and that all proper remediation steps were taken to resolve the issue. Mr. True also testified that the heating, ventilation, and air conditioning ("HVAC") system was cleaned to

---

[14] Pls.' Ex. No. 9.
[15] Pls.' Ex. No. 8.

ensure the indoor air quality. Mr. True testified that he re-rented the Showroom shortly after Moore Pizazz was evicted for failure to pay rent.

Moore Pizazz's subtenant at the Showroom, James Ross, testified at deposition[16] that Mr. or Mrs. Moore told him that they had told the landlord about the mold problem, but that he was only aware of an inspection at the Showroom. Mr. Ross testified that he remained in the Showroom because he was told that there was no mold.[17]

Other than the testimony of Mrs. Moore, Mr. True, and Mr. Ross, there was no evidence offered to the Court regarding the extent to which the Showroom was or was not contaminated with "toxic" mold.

On November 30, 2011, Mrs. Moore sent an email to Plaintiffs telling them that due to airborne mold in the Showroom, she had stopped all incoming shipments of goods. Mrs. Moore told Plaintiffs she was ill, but would get back to finishing their project as soon as possible. In her email, Mrs. Moore also stated that if Plaintiffs did not cooperate with her, she would be forced to file bankruptcy.[18] Mrs. Moore and Plaintiffs exchanged emails through December 5, 2015. Mrs. Moore wrote Plaintiffs that in addition to being ill, she was under a great deal of stress and that her husband was also ill and was having a nervous breakdown. Mrs. Moore assured Plaintiffs that their items had been ordered.[19]

Despite Mrs. Moore's stated intentions to complete Plaintiffs' project, Moore Pizazz did not finish the work or deliver the furniture listed on the Invoice. Mrs. Forbes testified that of the numerous items listed on the Invoice, Moore Pizazz only provided design services, fans, lighting fixtures, crown molding, family room cypress ceiling, grass cloth wallpaper, and some bedding.

---

[16] Mr. Ross' deposition testimony (Pls.' Ex. 6) was admitted into evidence without objection. (Doc. No. 94.)
[17] Pls.' Ex. No. 6.
[18] Pls.' Ex. No. 10.
[19] *Id.*

Mr. Forbes testified that on December 5, 2011, he went to the Showroom and encountered Mr. Moore. Mr. Forbes testified that Mr. Moore told him that the money was all gone, that it had been spent going to design shows in North Carolina, and that if Mr. Forbes wanted his money back, he should "hire a lawyer and get in line." Mr. Forbes testified that during this visit to the Showroom, he went into Moore Pizazz's back office to look for his own confidential information – the code to the gate to Plaintiffs' residence and financial documents relating to the closing on their home – and did not see any business books or records.

### *Moore Pizazz's Business Records*

Regarding Moore Pizazz's financial records, Mrs. Moore testified that although her husband did not own an interest in Moore Pizazz, he prepared the year-end financials and provided them to the company's accountant. Mrs. Moore testified that Moore Pizazz did not maintain corporate books, but did keep corporate minutes. She testified that she purchased and tried to learn Quickbooks but never learned how, so she relied on her husband. Other than Mrs. Moore's brief testimony regarding Quickbooks, there was no evidence regarding the extent to which Moore Pizazz maintained accounting records or the form, whether paper or electronic, in which the accounting records were maintained.

Mrs. Moore testified that due to the mold contamination, she left all the business records, including receipts for the items that Moore Pizazz had purchased on behalf of customers, in the Showroom. She testified that the landlord must have disposed of the books and records after Moore Pizazz vacated the Showroom. Moore Pizazz's subtenant, Mr. Ross, testified that he saw Defendants remove at least one computer from the Showroom.[20]

Mr. Moore testified that in December 2011, he prepared the final financial records for Moore Pizazz by looking at Moore Pizazz's bank account statements. Mr. Moore testified that after

---

[20] Pls.' Ex. No. 6, p. 22.

he prepared the records, he threw all the bank statements and other financial records in the trash. He

testified that sometime in 2012, he gave the financial records he had prepared to the accountant.

Defendants' Amended Statement of Financial Affairs[21] states that they had business income

in 2011 of $663.00. Mrs. Moore testified that while she did not take a salary from Moore Pizazz,

funds in Moore Pizazz's bank account were used to pay for personal expenses, such as groceries

and household bills, via a company debit card.

### *The State Court Action*

In January 2012, Plaintiffs sued Mrs. Moore and Moore Pizazz in state court for breach of

contract.[22] Mrs. Moore and Moore Pizazz did not defend the action. On May 1, 2012, the state court

entered final judgment for Plaintiffs and against Jennifer Moore and Moore Pizazz. The state court

found that Plaintiffs had paid Mrs. Moore and Moore Pizazz $91,912.11, and had received only

$19,137.64 of purchased items in return. Finding Moore Pizazz and Mrs. Moore in material breach

of the contract with Plaintiffs, the state court entered against Moore Pizazz and Mrs. Moore for

$72,774.47.[23] On May 8, 2012, Plaintiffs caused a judgment lien certificate to be filed with the

Florida Secretary of State.[24] On or about August 1, 2012, Plaintiffs caused the Lee County Sheriff's

Office to levy on two of Defendants' cars to satisfy their judgment lien.

---

[21] Pls.' Ex. No. 5.
[22] Pls.' Ex. No. 17.
[23] Pls.' Ex. No. 18. Although Plaintiffs' state court complaint sought damages for Florida Deceptive and Unfair Trade Practices Act, Florida Statutes 501.2015 ("FDUPTA"), alleging that Mrs. Moore's and Moore Pizazz's actions constituted unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade and/or commerce, the state court made no specific findings on this claim. The court did, however, award Plaintiffs their attorney's fees under Florida Statutes 501.2015.
[24] Pls.' Ex. No. 19.

### *Consignments to Posh Plum and Sales of Inventory*

Meanwhile, starting in April 2012, Mr. Moore removed merchandise items from the Showroom and delivered them to a consignment store, Posh Plum.[25] An employee of Posh Plum testified that Mr. Moore consigned 334 items valued by Posh Plum at $34,880.00, and received payments from Posh Plum of $8,253.25 between August 2012 and April 2013.[26] Of the 334 consigned items, 212 were consigned to Posh Plum after May 8, 2012, the date of Plaintiffs' judgment lien. In addition, Mr. Ross testified that he sold Moore Pizazz's inventory for over $10,000.00 with Mr. Moore's consent.[27]

Mr. Moore testified that he used the money received from inventory sales to pay Moore Pizazz's corporate obligations, including payments necessary to complete other jobs for other customers "who did not hire lawyers." In *Fiandola*, Mr. Moore specifically testified regarding work being done to complete jobs for specific Moore Pizazz customers.[28] Mrs. Moore testified that she was ill during this time period and did not know that her husband had taken Moore Pizazz assets to Posh Plum for consignment.

### *Defendants File for Bankruptcy; Section 341 Creditors' Meeting*

On August 7, 2012, Defendants filed their Chapter 7 bankruptcy petition. At the creditors' meeting in the bankruptcy case, Mr. Moore acknowledged that Defendants had failed to disclose in their bankruptcy schedules that they had sold a 1956 Ford Thunderbird and a 2003 Chevrolet HHR to third parties via Craigslist for a total of $35,000.00.[29] Mr. Moore testified that in Defendants' haste to prepare their bankruptcy petition (due to the levy upon their cars), their focus was on making full disclosure of all the assets they owned and the failure to disclose the prior sale of the

---

[25] Pls.' Ex. No. 11.
[26] Pls.' Ex. No. 12.
[27] Pls.' Ex. No. 6, pp. 15-18.
[28] *Fiandola*, Transcript, Adv. Pro. No. 9:12-ap-1054-FMD, Doc. No. 79, pp. 53-54.
[29] Pls.' Ex. No. 2, pp. 8-9 and 23-24.

Ford and Chevrolet vehicles was inadvertent. On the day following the creditors' meeting, Defendants amended their Statement of Financial Affairs to reflect the automobile sales.[30]

Mr. Moore testified at trial that because Defendants' home was been foreclosed upon, their attorney advised them that any rights they had in a Chinese Drywall class action lawsuit settlement had been lost. Mr. Moore also testified at trial regarding a trailer that was not listed in Defendants' bankruptcy schedules. He testified that the trailer was likely used to transport items from the Showroom to Posh Plum, and that he sold the trailer at some point. There was no evidence at trial regarding the ownership of the trailer.

## ANALYSIS

### A.   Burden of Proof

A plaintiff seeking to except a debt from discharge under §§ 523(a)(2)(A) and 523(a)(6) must prove all the essential elements of the claim by a preponderance of the evidence.[31] Exceptions to the discharge of a particular debt are strictly construed in favor of the debtor. Likewise, a plaintiff objecting to a debtor's discharge under § 727(a)(4)(A) for an alleged false oath or account must establish by a preponderance of the evidence that the debtor is not entitled to a discharge.[32] The same is true of § 727(a)(5)[33] and § 727(a)(3) claims.[34] Further, the denial of a debtor's discharge is an "extraordinary remedy"[35] and an "extreme penalty"[36] to the debtor. Therefore, any challenge to a

---

[30] Pls.' Ex. No. 5.

[31] *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991) (holding that the preponderance of the evidence standard applies to all § 523(a) non-dischargeability claims); *In re Pelchat*, 2014 WL 457776, at *2 (Bankr. N.D. Ga. Jan. 7, 2014) (citing *Grogan* in a § 523(a)(2)(A) case); *In re Ragucci*, 433 B.R. 889, 895 (Bankr. M.D. Fla. 2010) (citing *Grogan* in a § 523(a)(6) case).

[32] *In re Khanani*, 374 B.R. 878, 888 (Bankr. M.D. Fla. 2005).

[33] *In re Moore*, 2010 WL 1880573, at *7 (Bankr. N.D. Ala. May 6, 2010) (applying a preponderance of the evidence standard to § 727(a)(5) claim).

[34] *In re Khanani*, 374 B.R. at 887 (applying a preponderance of the evidence standard to § 727(a)(3) claim).

[35] *Dorsey v. DePaola*, 2012 WL 1957713, at *11 (M.D. Ala. May 31, 2012).

[36] *In re Nascarella*, 492 B.R. 914, 917 (Bankr. M.D. Fla. 2013).

debtor's discharge must be construed strictly against the objecting party and liberally in favor of the debtor.[37]

### B.   Plaintiffs' Claims

#### I.   *Failure to Maintain Records Under § 727(a)(3) as to Jennifer Moore and Robert Moore*

As set forth above, Plaintiffs' claim under § 727(a)(3) was tried with the consent of the parties. Under § 727(a)(3), the court shall grant the debtor a discharge unless:

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

The purpose of § 727(a)(3) is to ensure that creditors and the trustee are given sufficient information to understand the debtor's financial condition.[38] This recordkeeping requirement does not mandate a full accounting of every business transaction, but there should be some orderly records from which the debtor's present and past financial condition can be ascertained with substantial completeness and accuracy.[39] Each case is determined on its own facts, although a debtor who is involved in business may be subject to a more stringent standard than a debtor who is an unsophisticated wage earner.[40] A debtor is required to "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past."[41]

---

[37] *Id.*; *see also In re Mitchell*, 633 F.3d 1319, 1327 (11th Cir. 2011).

[38] *In re Khanani*, 374 B.R. at 886.

[39] *Id.*

[40] *Id.*

[41] *In re Horton*, 621 F.2d 968, 971 (9th Cir. 1980) (holding that debtor had a duty to maintain his own records and could not substitute the records of his daughter for his own).

Once the objecting party makes an initial showing that the books and records are inadequate,[42] the burden shifts to the debtors to show that "such act or failure was justified under all of the circumstances of the case."[43] A debtor must explain his lack of financial documentation in such a manner to convince the court of good faith and businesslike conduct.[44]

Mrs. Moore testified that she was the sole owner of Moore Pizazz. She testified that she did not maintain any financial records, but that Mr. Moore was responsible for all of their finances. Mr. Moore corroborated that testimony, explaining that after Moore Pizazz ceased doing business but before it vacated the premises on December 1, 2011, he prepared the 2011 "year-end financials" by tallying the monthly balances from bank statements onto a separate piece of paper, which he then gave to an accountant sometime in 2012. Mr. Moore testified that before vacating the Showroom, he ripped up the bank statements and threw them away because he had been instructed not to remove paperwork from the mold-contaminated space. The subtenant, Mr. Ross, testified that he saw a computer being removed from the premises.

Given the nature of Moore Pizazz's business, including tracking numerous orders for multiple customers, there is no question that Moore Pizazz would have maintained business records. As the owner of Moore Pizazz, Mrs. Moore had the duty to maintain its business records. She abdicated her duties by allowing Mr. Moore to handle all of the financials for company. In so doing, Mr. Moore assumed the shared responsibility for maintaining the books and records.

In *Rhoades v. Wikle*,[45] the Ninth Circuit Court of Appeals considered whether the debtor had a shared duty with his wife, the owner of a real estate business, to maintain business records, such that the failure to do so precluded a discharge in bankruptcy. In *Rhoades,* the court found that

---

[42] *In re Sadler*, 282 B.R. 254, 263 (Bankr. M.D. Fla. 2002).
[43] *In re Breedlove*, 545 B.R. 359, 373 (Bankr. M.D. Ga. 2016) (quoting § 727(a)(3)).
[44] *In re Khanani*, 374 B.R. at 886.
[45] 453 F.2d 51, 52 (9th Cir. 1971).

although the debtor wife ordinarily kept the records of the business, the debtor husband's interest in the affairs of the company was impossible to separate from that of his wife.[46] Similarly, in *In re Cox*, the court held that the debtor shared a duty to keep records with her spouse because she was inextricably involved in her spouse's business.[47]

Because of the intertwined nature of Defendants' finances with those of Moore Pizazz, Moore Pizazz's financial records are critical to an understanding of Defendants' financial condition.[48] When a debtor destroys, conceals, or falsifies books of a corporation that are necessary to the understanding of the debtor's financial condition and business transactions, a discharge should be denied.[49] If a debtor engages in objectionable conduct in a case involving a corporation of which the debtor is an officer, director, or controlling person, the debtor may be denied a discharge in the debtor's own case.[50] As Mr. Moore had a shared duty to maintain the records, his actions may be imputed to Mrs. Moore.[51] And here the duty to preserve the records is further amplified by the fact that Defendants were contemplating filing for bankruptcy at the time of the destruction of the records. If the failure to keep or preserve proper books in contemplation of filing for bankruptcy is unjustifiable, discharge should be denied.[52]

Both Defendants had a duty to maintain the business records of Moore Pizazz. But there are no records before the Court from which Defendants' and Moore Pizazz's financial condition and material business transactions can be ascertained. The Court finds that Plaintiffs have made a *prima facie* showing that Defendants have not maintained adequate books and records.

---

[46] *Id.* at 52.
[47] 904 F.2d 1399, 1403 (9th Cir. 1990).
[48] *In re Esposito*, 44 B.R. 817 (Bankr. S.D.N.Y. 1984).
[49] *Id.*
[50] *In re Lopez*, 532 B.R. 140 (Bankr. C.D. Cal. 2015).
[51] *In re Fineberg*, 36 F.2d 392 (W.D.N.Y. 1929) (finding that if a debtor leaves the conduct of his business and recordkeeping to an agent, the debtor is ultimately responsible for the failure to keep proper books or records).
[52] *In re Horton*, 621 F.2d. at 971.

The burden then shifts to Defendants to establish that their failure to maintain records was justified under the circumstances. Mrs. Moore testified that she was instructed not to remove any "paper" items from the Showroom due to the mold contamination. But other than her testimony, which conflicted with that of the landlord's agent, Mr. True, and the subtenant, Mr. Ross, she offered no evidence to support her description of the Showroom as being so infected with toxic mold that not only was she ill as a result, but also that no paperwork could be removed.

Mrs. Moore testified that she left all documents behind and does not know what happened to them; she speculated that the Showroom's landlord had them or possibly threw them out. But Mr. True testified that there were no documents of any kind left in the Showroom, other than some trash and samples. Mr. Forbes testified that he looked for books and records when he went to the Showroom on December 5, 2011, and did not find any. And Mr. Moore testified that he threw all of the documents in the trash because of the mold.

Defendants' carelessness with Moore Pizazz's books and records is particularly egregious as they knew that at least two of Moore Pizazz's customers, Plaintiffs and the Fiandolas, were unhappy with the services provided, and because Defendants were already contemplating the possibility of filing a bankruptcy case. As early as November 30, 2011, Mrs. Moore emailed Mrs. Forbes that "if you do not wish to cooperate, I will be forced to file for bankruptcy."[53]

Although Defendants contend that they provided all required documentation to the Chapter 7 Trustee assigned to their case, they did not offer into evidence a single document that would qualify as book or record, not the year-end financials that Mr. Moore testified he delivered to Moore Pizazz's accountant, nor tax returns for either Moore Pizazz or Defendants. Nor did Defendants provide any evidence regarding the nature of the books and records, whether paper or electronic, or why paper records could not have been scanned in and retained on a computer. Mrs. Moore's

_____

[53] Pls.' Ex. No. 10.

explanation for her lack of involvement is based upon her health issues at the time and Mr. Moore's breakdown,[54] but she offered no corroborating evidence.

After careful consideration of the evidence, the Court finds that Defendants' failure to retain, protect, and produce their personal and business financial records was not justified under all of the circumstances of the case. Therefore, Defendants' discharge is denied under § 727(a)(3).

Having found that Defendants' discharge should be denied under § 727(a)(3), the Court will nonetheless address Plaintiffs' arguments raised in their Complaint in turn below.

## II.    *Failure to Explain Loss of Assets Under § 727(a)(5)*
## *(Count IV as to Jennifer Moore)*

Plaintiffs also seek to deny Mrs. Moore a discharge for her failure to account for over $72,774.47 of their payments to Moore Pizazz. Under § 727(a)(5), a debtor may be denied her discharge if she "has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."[55] But as contrasted with § 727(a)(7), which relates to a debtor's actions regarding an insider who is also a debtor,[56] § 727(a)(5) concerns only assets belonging to the debtor.[57] Section 727(a)(5) does not require Mrs. Moore to explain the deficiency of Moore Pizazz's assets because the assets were owned by the corporation, not Mrs. Moore.

In *Fiandola*, the Eleventh Circuit Court of Appeals affirmed this Court's ruling that Defendants should not be denied their discharge of debts under § 727(a)(5) for failure to explain the loss of Moore Pizazz's assets because Defendants as individual debtors were under no obligation to

---

[54] *Fiandola*, Transcript, Adv. Pro. No. 9:12-ap-1054-FMD, Doc. No. 79, pp. 86-90.

[55] § 727(a)(5).

[56] § 727(a)(7) bars the discharge of a debtor who has committed any act specified in § 727(a)(2)-(6) in connection with another case under title 11, concerning an insider.

[57] *See In re Harmon*, 379 B.R. 182, 190 (Bankr. M.D. Fla. 2007) (the party objecting to discharge must first prove that the debtor at one time owned the assets which are no longer available for creditors). As explained below in connection with Plaintiffs' Count III for conversion against Mrs. Moore, Plaintiffs' deposits became property of Moore Pizazz.

explain the loss of corporate assets.[58] The court found that the plaintiffs failed to meet their burden of showing that the assets of the corporation were owned by Defendants such that § 727(a)(5) would require them to satisfactorily account for the loss of assets.[59]

Similarly, in this case, Plaintiffs introduced no evidence at trial to establish that Mrs. Moore had an interest in the assets owned by Moore Pizazz. Therefore, Mrs. Moore was under no obligation to satisfactorily explain the loss of corporate assets and her discharge should not be denied under § 727(a)(5) of the Bankruptcy Code.

### III.   False Oath Under § 727(a)(4)(A)
### (Count I as to Jennifer Moore; Count VII as to Robert Moore)

Plaintiffs contend that Defendants' discharge should be barred because they failed to (1) disclose the two prepetition vehicle sales and the sale of a trailer; (2) failed to include the sales and the income from the sale of business assets as part of their personal income on the Means Test incorporated in Schedule B22A; and (3) disclose their claim in a Chinese Drywall class action lawsuit settlement as an asset.

Under § 727(a)(4)(A), discharge should be denied when a false oath or account was knowingly and fraudulently made and related to a material fact.[60] A false oath is material when "it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[61] However, because § 727(a)(4)(A) aims to "prevent knowing fraud or perjury," the objection should not apply to "minor errors."[62] As the court stated in *In re Dupree*, "[t]here is a difference between a debtor who is trying to hide assets with a false oath or material omissions in his Statement of Financial Affairs,

---

[58] 619 F. App'x at 954.
[59] *Id.*
[60] *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984).
[61] *Id.*
[62] *In re Dupree*, 336 B.R. 490, 494 (Bankr. M.D. Fla. 2005) (quoting *In re Wills*, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999)).

and a debtor who, through inadvertence, mistake, or ignorance of the issue of materiality in his disclosures, may omit certain assets in his original Statement of Financial Affairs."[63] Thus, courts analyze the omissions or nondisclosures to determine whether they were part of a scheme to retain assets for the debtor's own benefit at the expense of creditors.[64]

    (a)    <u>Sale of Automobiles and Trailer</u>

At trial, Plaintiffs relied upon the evidence admitted during the *Fiandola* trial and presented no additional evidence or testimony to support their claim under § 727(a)(4). In *Fiandola*, the evidence established that when the Chapter 7 Trustee asked Mr. Moore about prepetition vehicle sales at the § 341 creditors' meeting, Mr. Moore testified that he had sold two cars in January 2012.[65] Shortly thereafter, Defendants amended their statement of financial affairs to include these sales. In *Fiandola*, this Court found that Defendants' failure to disclose the car sales and the resulting proceeds was not knowing or fraudulent because the initial failure to disclose the car sales was unintentional, Defendants were forthcoming with corrected testimony at the § 341 creditors' meeting, and the original omissions were cured by the subsequent amendment.

The Eleventh Circuit Court of Appeals affirmed this Court's ruling.[66] As the facts before the Court are identical to those admitted in *Fiandola*, the Court again finds that Defendants' failure to disclose the car sales and the resulting proceeds was not knowing or fraudulent, and the original omissions were cured by the subsequent amendment.

To the extent that Plaintiffs offered evidence at trial regarding Defendants' failure to list the ownership or the sale of a trailer in their bankruptcy schedules, the Court finds that Plaintiffs failed

---

[63] *Id.*

[64] *Id.*

[65] Pls.' Ex. No. 2, p. 8.

[66] *In re Moore*, 619 F. App'x at 954.

to meet their burden of proof regarding the ownership of the trailer or that any omission was material.

      (b)    <u>Imputed Income from Automobile Sales and Moore Pizazz</u>

Plaintiffs contend that Defendants committed a false oath because their Amended Statement of Financial Affairs[67] discloses income in 2012 of $4,000.00. Plaintiffs contend that this does not include the income from the two automobiles sold and that the income listed on their "Means Test" does not include income from Moore Pizazz.

First, with respect to Plaintiffs' "Means Test" claim, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") added § 707(b)(1)-(2), commonly referred to as the "Means Test," to Chapter 7 of the Bankruptcy Code. The Means Test establishes a presumptive bar to obtaining relief in a Chapter 7 case for "debtors whose income is above their state's median income for a family of the same size and *whose debts are primarily consumer debts*."[68] Official Form B22A,[69] facilitates § 707(b) by providing the mechanical formula for application of the Means Test.

Because the Means Test only applies to debtors whose debts are primarily consumer debts, form B22A is required to be completed by debtors whose debts are primarily consumer debts for the purpose of determining their eligibility for relief under Chapter 7. Here, Defendants' debts were not primarily consumer debts, and they indicated as such on their Form B22A, leaving the rest of the form blank. Defendants did not commit a false oath with respect to their Form B22A as they were not required to complete the Means Test.

Second, regarding the income listed on their Statement of Financial Affairs, Defendants disclosed the automobile sales to the Trustee. Although Defendants testified that they used funds in

---

[67] Pls.' Ex. No. 5.
[68] *In re Ralston*, 400 B.R. 854, 869 (Bankr. M.D. Fla. 2009) (emphasis supplied).
[69] Official Form B22A was renumbered as B122A-1, effective December 1, 2015.

Moore Pizazz's bank account to pay for groceries and household supplies, there was no evidence that their Statement of Financial Affairs did not accurately reflect their income. This claim was previously raised in *Fiandola*. On very similar facts, the Court found that any failure to disclose Moore Pizazz's income did not constitute a false oath under § 727(a)(4)(A) as the income was used to pay Moore Pizazz's debts. The Court's ruling was affirmed on appeal.[70] Here, Plaintiffs did not introduce additional facts or evidence that would alter this Court's finding.

    (c)    <u>Purported Chinese Drywall Claim</u>

Last, on Defendants' alleged failure to disclose their interest in the Chinese Drywall class action lawsuit settlement, there was no evidence that Defendants had such an interest. And even if they did, the omission was not knowing and fraudulent because Mr. Moore was advised by counsel that the claim had been extinguished because of the foreclosure of the property giving rise to the claim.

The Court concludes that Plaintiffs have not satisfied their burden of proof on their § 727(a)(4)(A) claim.

### *IV.*    *Fraud Under § 523(a)(2)(A) (Count II as to Jennifer Moore)*

Plaintiffs contend that Mrs. Moore fraudulently obtained their deposits by misrepresenting that Moore Pizazz would use the deposits to complete their orders and that Mrs. Moore always intended to use the deposits for her own personal purposes.[71] Section 523(a)(2)(A) excepts debts from discharge to the extent they were obtained by false pretenses, a false representation, or actual fraud.

To prevail on their claim, Plaintiffs must establish that Mrs. Moore made a false representation with the intention of deceiving them; that Plaintiffs justifiably relied on that false

---

[70] *In re Moore*, 619 F. App'x at 954 (holding that "the bankruptcy court correctly concluded that his failure to disclose did not constitute a false oath under 11 U.S.C. § 727(a)(4)(A).").

[71] Doc. No. 1, ¶¶ 29-34.

representation; and that they sustained a loss as a result of the false representation.[72] In addition, the alleged misrepresentation must have occurred and been relied upon when the debt was incurred,[73] in this case, when Plaintiffs gave their checks to Mrs. Moore. Although a misrepresentation may include a false representation of intent, such as a promise to act,[74] the breach of a future intention to act does not necessarily create a misrepresentation if intervening events caused the future actions to deviate from prior intentions. In other words, the mere failure to perform obligations under a contract is not a basis from excepting a debt from discharge under § 523(a)(2). For example, in *In re Daprizio*, the court found that plaintiff's claim failed because there was "no evidence that at the time of the inception of the loan or at the renewals that there was any false pretenses, a false representation, or actual fraud that was relied upon by [p]laintiff."[75] A debtor's fraudulent intent under § 523(a)(2)(A) can be inferred from circumstantial evidence and the totality of the circumstances.[76]

Here, Plaintiffs signed the Engagement Letter with Moore Pizazz in March 2011 and paid Moore Pizazz $51,500.00.[77] In September 2011, Plaintiffs paid Moore Pizazz an additional $40,412.11.[78] Mrs. Moore testified that when she accepted Plaintiffs' deposits, she intended to complete their projects, but in November 2011, the Showroom flooded, mold was discovered, and she became ill. Mrs. Moore attributed her failure to complete Plaintiffs' projects to the impact of the mold problem on Moore Pizazz's business operations and her poor health. While Mrs. Forbes testified that she conferred with the third-party vendors and believed the items Mrs. Moore

---

[72] *In re Wood*, 245 F. App'x 916, 917-18 (11th Cir. 2007).
[73] *In re Daprizio*, 365 B.R. 268 (Bankr. S.D. Fla. 2007).
[74] *In re Foster*, 2010 WL 2025784, at *2 (Bankr. N.D. Ga. Feb. 26, 2010)
[75] *In re Daprisio*, 365 B.R. at 280.
[76] *In re Thomas*, 217 B.R. 650, 653 (Bankr. M.D. Fla. 1998).
[77] Pls.' Ex. No. 8.
[78] *Id.*

represented had been ordered at the September 28, 2011 meeting had not actually been ordered, there was no evidence of actual misrepresentation by Mrs. Moore.

Mr. True testified the mold contamination was *de minimis* and was immediately remediated in conjunction with the cleaning of the HVAC system, although he acknowledged that mold was found in the Showroom and remediation was necessary. However, the Court finds Mrs. Moore's testimony regarding her health issues and her inability to work to be credible. Mrs. Moore had been referred at least two customers – Plaintiffs and the Fiandolas – through a Pulte employee, and would have no reason to wish to disrupt her source of referrals. There was no evidence that Mrs. Moore did not intend for Moore Pizazz to perform its obligations to Plaintiffs when she accepted their payments. Any other representations made by Mrs. Moore to Plaintiffs regarding Moore Pizazz's fulfillment of their order were made after Plaintiffs delivered their payments to Moore Pizazz to her.

Based upon the circumstantial evidence and the totality of the evidence, the Court concludes that Mrs. Moore had no fraudulent intent when she accepted Plaintiffs' deposits.

### V.  Conversion Under § 523(a)(6) (Count III as to Jennifer Moore)

Plaintiffs allege that Mrs. Moore willfully and maliciously injured them by committing the tort of conversion when she misappropriated for her own use over $72,774.47 of the monies paid by them to Moore Pizazz or the goods that were purchased with those funds. Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[79] Willful and malicious injury under § 523(a)(6) includes willful and malicious conversion, which courts have defined as "the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights."[80]

---

[79] § 523(a)(6).
[80] *In re Wolfson*, 56 F.3d 52, 54 (11th Cir. 1995).

Here, Plaintiffs' contract with Moore Pizazz did not expressly state that their cash deposits would remain Plaintiffs' property. In *National Tour Ass'n, Inc. v. Rodriguez*,[81] the plaintiff asserted a similar conversion theory; the court found that the defendant's use of customer deposits to pay for general business expenses did not constitute conversion because there was no evidence that the defendant had represented to the customers that their deposits would remain the customers' property. The *Rodriguez* court rejected the plaintiff's argument that the defendant acted as agent or bailee by holding its deposits on its behalf and concluded that the defendant had not committed conversion by depositing the customer deposits into her business's general account and then using those funds to pay for general business expenses.[82]

As in *Rodriguez*, there is no evidence that Mrs. Moore was Plaintiffs' agent, such that Plaintiffs' payments to Moore Pizazz remained their property or that Mrs. Moore was prohibited from using those payments to pay for Moore Pizazz's general business expenses, including rent for the Showroom. The Engagement Letter did not provide that Plaintiffs' deposits would be segregated or that Moore Pizazz would be restricted in its use of Plaintiffs' deposits.

For the reasons stated above, the Court finds that Plaintiffs have not met their burden of proof on their § 523(a)(6) claim.

### VI.    Conversion Under § 523(a)(6) (Count V as to Robert Moore)

Plaintiffs allege that the deposits they advanced to Moore Pizazz and the goods purchased with those deposits remained their property such that Mr. Moore's willful and malicious disposition of the goods with Posh Plum excepts their debt from discharge under § 523(a)(6). Under § 523(a)(6), any debt "for willful and malicious injury by the debtor to another entity or to the

---

[81] 221 B.R. 1012, 1014 (Bankr. M.D. Fla. 1998).
[82] *Id.* at 1017.

property of another entity" is excepted from discharge.[83] Willful and malicious injury includes willful and malicious conversion, which courts have defined as "the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights."[84]

To prevail on a claim for conversion under § 523(a)(6), Plaintiffs must first prove that Mr. Moore engaged in the unauthorized exercise of ownership over goods that belonged to them to the exclusion of their rights.[85] In other words, Plaintiffs must prove that they retained an ownership interest in the payments they made to Moore Pizazz or that they had an interest in the merchandise that Mr. Moore sold under consignment to Posh Plum.

But, as explained above, Plaintiffs did not retain an ownership interest in the deposits paid to Moore Pizazz. Consequently, the use of the deposits for general operating expenses does not rise to the level of conversion under § 523(a)(6) and does not satisfy the requirement of the willful and malicious injury exception to discharge. And Plaintiffs presented no evidence that they were the owners of any items consigned to Posh Plum or other assets of Moore Pizazz that were sold. However, courts have recognized that a true ownership right is not necessary to support a cause of action for conversion. For example, a lienholder is considered to be an "owner" for purposes of a conversion claim if the lienholder has a present right of possession to the property in question.[86] Other courts acknowledge that a possessory right is sufficient to confer standing on a plaintiff to sue for conversion.[87]

---

[83] § 523(a)(6).
[84] *In re Wolfson*, 56 F.3d at 54.
[85] *Id.*
[86] *Bel-Bel Intern. Corp. v. Community Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998).
[87] *Matter of Dino*, 17 B.R. 316, 318 (Bankr. M.D. Fla. 1982); *Spec. Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1102 (S.D. Fla. 2000) ("All that a plaintiff must show is a right of possession."); *Page v. Matthews*, 386 So. 2d 815, 816 (Fla. 5th Dist. Ct. App. 1980) ("In Florida, an action for conversion is regarded as a possessory action and the plaintiff must have a present or immediate right of possession of the property in question.").

The question then is whether Plaintiffs' judgment lien against Moore Pizazz rises to the level of "ownership" necessary to state a claim for conversion. A possessory right may arise either by a valid judgment lien or under a writ of execution.[88] Assuming, *arguendo*, that Plaintiffs' judgment lien conferred upon them a possessory right in Moore Pizazz's assets, Plaintiffs must also prove by a preponderance of the evidence that Mr. Moore "willfully" and "maliciously" injured them or their property. For a debtor to act willfully, it requires a showing of "specific intent to inflict the injury or if he knew with substantial certainty that the injury would result from his actions."[89] For a debtor to act maliciously, the injury must be "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'"[90] Malice may be implied or constructive.[91]

In total, Mr. Moore consigned 334 items to Posh Plum.[92] Of the 334 consigned items, 212 were consigned to Posh Plum after May 8, 2012, the date of Plaintiffs' judgment lien.[93] Mr. Moore's act of consigning Moore Pizazz's assets to Posh Plum was unquestionably willful; he intentionally and voluntarily sold the items to Posh Plum. But to find that Mr. Moore acted maliciously, the Court must find that he acted intentionally to deprive Plaintiffs of their lawful exercise of rights in the collateral or its proceeds by disposing of it.[94] In other words, Mr. Moore had to know of Plaintiffs' right to the collateral and to have acted with the requisite intent to act against their rights.

---

[88] *In re Moore*, 508 B.R. at 498.
[89] *In re Lovvorn*, 430 B.R. 318, 325 (Bankr. M.D. Ga. 2010) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998)).
[90] *In re Walker*, 48 F.3d 1161, 1164 (11th Cir. 1995) (quoting *In re Ikner*, 883 F.2d 986, 991 (11th Cir.1989)).
[91] *Id.* at 1164.
[92] Pls.' Ex. No. 12.
[93] Pls.' Ex. No. 19.
[94] *In re LaGrone*, 230 B.R. 900, 904 (Bankr. S.D. Ga. 1999).

Florida law does not require that a judgment debtor be notified of a judgment lien entered against him.[95] Therefore, actual knowledge of a judgment lien cannot be necessarily inferred simply because a judgment lien exists. While Mrs. Moore testified that she knew that Plaintiffs had filed a lawsuit against her, there was no evidence before the Court that Mr. Moore knew of the judgment lien against his wife and Moore Pizazz's assets. Without such knowledge, Mr. Moore cannot be found to have acted maliciously with the intent to injure the Forbes by disposing of their secured collateral.[96]

Accordingly, the Court finds that Plaintiffs have not meet their burden under § 523(a)(6).

### VII.    *Civil Conspiracy to Commit Conversion Under § 523(a)(6) (Count VI as to Jennifer and Robert Moore)*

Plaintiffs allege that Defendants conspired to use Plaintiffs' deposits for their own use, including using their deposits to obtain new office space instead of purchasing goods to fulfill Plaintiffs' orders.[97] To establish a claim for civil conspiracy to convert, a plaintiff must establish the underlying intentional tort. The conspiracy by itself is insufficient.[98] As discussed above, Plaintiffs have not established an underlying conversion by Defendants. Thus, Plaintiffs cannot establish the underlying requisite tort to support this non-dischargeability claim.

### C.    Motion to Allow Excluded Evidence and Motion for a New Trial

On July 11, 2016, over four months after the close of the evidence, Plaintiffs moved this Court to reopen the evidence under Federal Rule of Civil Procedure 59, incorporated by Federal Rule of Bankruptcy Procedure 9023.[99] Plaintiffs allege that they had only recently obtained timely

---

[95] *See generally* Fla. Stat. §§ 55.201-55.209.
[96] *In re Crisafi*, 205 B.R. 444 (Bankr. M.D. Fla. 1996) (finding absent evidence that debtor was aware of merchant's claimed security interest, debtor's conduct in selling goods was not "malicious," for debt dischargeability purposes).
[97] Doc. No. 31, ¶ 66.
[98] *In re Nofziger*, 361 B.R. 236, 243 (Bankr. M.D. Fla. 2006).
[99] Doc. Nos. 99 and 100.

subpoenaed bank statements that would show misrepresentations and fraud on the Court. Plaintiffs

claim they did not timely include the bank statements on their exhibit list or exchange them with

Defendants because, although they had timely subpoenaed the bank records, the records had only

recently been received from the bank. Plaintiffs contend that there is no prejudice to Defendants as a

judgment has not yet been entered and Defendants could review the bank statements and conduct

depositions. Defendants oppose the motion.[100]

> Federal Rule of Civil Procedure 59 states:
>
> [a]fter a nonjury trial, the court may, on a motion for new trial, open the judgment
> if one has been entered, take additional testimony, amend findings of fact and
> conclusions of law or make new ones, and direct the entry of a new judgment.[101]

Generally, a Rule 59 motion is made following the entry of a judgment. The Eleventh

Circuit Court of Appeals has found that when a motion is made following the entry of judgment, the

only grounds for granting such a motion are "newly-discovered evidence or manifest errors of law

or fact."[102] If a party seeks to introduce additional evidence while the matter is under advisement

with the Court and prior to the entry of a final judgment, it is considered as a motion to reopen the

evidence.

The authority to reopen a record has been recognized as a derivative of Rule 59.[103] It is

distinguishable from a Rule 59 motion because the moving party is seeking to supplement the

---

[100] Doc. No. 101.

[101] Fed. R. Civ. P. 59(a)(2).

[102] *Jones v. Thomas*, 605 F. App'x 813, 814 (11th Cir. 2015).

[103] *See Caracci v. Brother Int'l Sewing Mach. Corp. of La.,* 222 F. Supp. 769, 771 (E.D. La. 1963), *aff'd,* 341 F.2d 377 (5th Cir. 1965) ("Even though there is no express statutory provision of substantive law specifically allowing the reopening of a trial, the court finds that such has become a rule of law supplied by the jurisprudence. It appears to be a cannibalization of those qualities found in Rules 59 and 60, Federal Rules of Civil Procedure. . . . ").

record, rather than reconsider, alter, or amend a judgment.[104] Thus, the court need not find that the evidence is newly discovered or would demonstrate a manifest error of law or fact;[105] instead, the decision to reopen the evidentiary record is within the sound discretion of the court.[106]

In determining whether to reopen a hearing for additional evidence the court should consider: (1) whether the additional evidence is material to the case; (2) whether the opposing party had an opportunity for cross-examination; (3) whether the opposing party would suffer prejudice; and (4) whether the failure to originally introduce the evidence reflected a lack of diligence by the moving party.[107]

Here, the Court finds that the failure to originally introduce the evidence reflects a lack of diligence on Plaintiffs' part. This adversary proceeding was filed on November 12, 2012, and was originally set for trial on May 21, 2013.[108] As discussed above, the companion case, *Fiandola v. Moore*, was tried first before the Court in February of 2014. At the conclusion of the *Fiandola* trial, the parties agreed to defer trial of Plaintiffs' case until after the Court's ruling in *Fiandola*, and thereafter until resolution of the appeals in that case.[109] In *Fiandola*, the Court entered judgment for Defendants.[110] This Court's ruling was affirmed by the District Court on appeal,[111] and by the Eleventh Circuit Court of Appeals in 2015.[112] The mandate issued from the Eleventh Circuit in November 2015.[113]

---

[104] *In Matter of Dunson*, 2014 WL 7793689, at *1 (Bankr. N.D. Ga. Sept. 16, 2014) (quoting 12 Moore's Federal Practice § 59.13(3)(c) (Matthew Bender 3d ed. 2002) ("A Rule 59 motion is distinct from a motion to reopen to take additional testimony. A Rule 59 motion is made only after the entry of a judgment, whereas a motion to reopen is most commonly made . . . while the judge has the case under advisement. . . .")).

[105] *Id.* at *4.

[106] *Id.* at *2 (quoting *Romeo v. Sherry*, 308 F. Supp. 2d 128, 138-39 (E.D. N.Y. 2004)).

[107] *Id.*

[108] Doc. Nos. 1, 10.

[109] Doc. No. 63.

[110] *In re Moore*, 508 B.R. 488 (Bankr. M.D. Fla. 2014).

[111] *In re Moore*, 2015 WL 1020368 (M.D. Fla. Mar. 9, 2015).

[112] *In re Moore*, 619 F. App'x 951 (11th Cir. 2015).

[113] District Court Case 2:14-cv-00335-SPC, Doc. No. 16.

The Court held a status conference in this proceeding on October 29, 2015, and set the matter for trial four months later on February 26, 2016.[114] Plaintiffs had more than ample time during the pendency of this case to subpoena the bank records and timely exchange them with opposing counsel prior to trial. Plaintiffs cannot now circumvent the Court's finding at trial by moving to reopen while the matter is under advisement with the Court.

For the foregoing reasons, the Court, in its discretion, will not reopen the evidence, and Plaintiffs' motion to reopen is denied.

## CONCLUSION

For the reasons set forth above, the Court concludes that Plaintiffs have met their burden of proof on their § 727(a)(3) claim and Defendants' discharge shall be barred. Plaintiffs have not met their burden of proof on their other claims under § 727 and § 523. The Court will enter a separate judgment in favor of Plaintiffs.

Lastly, the Court will enter an order denying *Plaintiffs' Amended Motion to Allow Excluded Evidence and Motion for New Trial* (Doc. No. 100).

Attorney Alan Hamisch is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.

---

[114] Doc. No. 82.